IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THEODORE E. WEATHERBEE, by his next friend )
and agent, CHERYL L. VECCHIO, )
)
)
Plaintiff, )
v. ) C.A. No. 07-134 Erie
) Judge McLaughlin
ESTELLE B. RICHMAN, in her official capacity )
as Secretary of the Commonwealth of Pennsylvania )
Department of Public Welfare, )
)
Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Defendant's motion to dismiss for failure to state a claim pursuant to Fed .R. Civ. P. 12(b)(6).

### I. BACKGROUND

On September 1, 2006, Plaintiff Theodore E. Weatherbee ("Weatherbee") was admitted to Golden Living Center-Kinzua nursing facility in Warren, Pennsylvania. (Complaint ¶5). On February 28, 2007, Plaintiff requested a resource assessment from the Department of Public Welfare ("DPW"), the agency charged with administering the Medicaid Program within the Commonwealth of Pennsylvania, in order to determine his eligibility for Medical Assistance - Long Term Care (MA-LTC) benefits to assist with his nursing home expenses. (Complaint ¶7). After allowing for the available community spouse resource allowance (CSRA) permitted under the Medicare Catastrophic Coverage Act of 1988 (hereinafter, "Medicaid Act") and other available deductions, the DPW

determined that Weatherbee had $442,696.05 in available resources to pay for nursing facility services. (Complaint ¶8).

On September 22, 2006, Weatherbee's wife, Adeline A. Weatherbee ("Adeline"), spent $10,000 on two pre-paid funerals. On November 14, 2006, she spent $21,252.50 on a new vehicle. (Complaint ¶9). Both purchases were permissible under MA-LTC regulations.

On November 29, 2006, Adeline used the remaining available resources to purchase a single premium immediate irrevocable annuity (#A005390257) (hereinafter, the "Annuity" or "Weatherbee Annuity") from the Jefferson-Pilot Life Insurance Company. (Complaint ¶10). This annuity was primarily funded through an existing $387,756.06 deferred annuity owned by Plaintiff and his wife. The new annuity provided for a payment stream to Adeline, the community spouse, in the amount of $4,423.47 per month for 107 months. Id. The annuity contract contained an endorsement (form AE-147) purporting to restrict assignment or transfer of the policy:

> Assignment. This policy is irrevocable and immediate. This policy cannot be transferred, surrendered or assigned. This policy has no cash value. The terms of this provision apply and take precedence over any other provision of this policy which are [sic] inconsistent with these statements.

(Complaint ¶13; Exhibit B).

On February 28, 2007, Plaintiff filed an application for MA-LTC benifits with DPW seeking assistance with his nursing home bill. (Complaint ¶15). DPW did not dispute the purchase of the prepaid funerals and new vehicle, but denied eligibility after determining that the payment stream from the Jefferson-Pilot annuity was an available resource to Weatherbee:

> 55 PA. Code §178.1(a), 55 PA. Code §178.1(g), 55 PA. Code §178.1(I). Based on the above regulations, your application for nursing home payments/Medicaid is being rejected based on your household's excess resources including the annuity with Jefferson-Pilot Life Insurance Company-A005390257. The spousal resource limit maximum is currently $101,640.

(Complaint ¶16; Exhibit D). The DPW determined that the income stream from the annuity was an available resource because the income stream could be sold on the secondary market for cash.

(Complaint ¶19). In so doing, it relied in part on the provisions of 62 PA. STAT. ANN. § 441.6(b) and (c) (hereinafter, the "Pennsylvania statute").[1]

Weatherbee initially requested an administrative hearing from DPW. However, on May 30, 2007, Weatherbee, by his next friend and agent Cheryl L. Vecchio, filed the instant action for declaratory and injunctive[2] relief pursuant to 42 U.S.C. §1983 against Estelle B. Richman, Secretary of the Department of Public Welfare. Specifically, Weatherbee seeks a declaration that 62 PA. STAT. ANN. § 441.6 is preempted by the Medicaid Act and that the DPW's denial of benefits in this case was improper.

---

[1] The statute provides in relevant part:

> (b) Any provision in any annuity or other contract for the payment of money owned by an applicant or recipient of medical assistance, or owned by a spouse or other legally responsible relative of such applicant or recipient, that has the effect of limiting the right of such owner to sell, transfer or assign the right to receive payments thereunder or restricts the right to change the designated beneficiary thereunder is void.
>
> (c) In determining eligibility for medical assistance, there shall be a rebuttable presumption that any annuity or contract to receive money is marketable without undue hardship.

62 PA. STAT. ANN. § 441.6.

[2] Weatherbee initially requested that this Court issue a preliminary injunction requiring DPW to provide Medicaid benefits during the pendency of this lawsuit. However, the parties were able to reach an agreement regarding the allegations supporting the motion for preliminary injunction and, accordingly, the motion was denied as moot at the oral hearing held on October 25, 2007. (See Oral Hearing Transcript, October 25, 2007, pp. 2-3) (hereinafter "Transcript").

## II. STANDARD FOR REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, ___ U.S. ___, ___ 127 S.Ct. 2197, 2200 (2007); Neitzke v. Williams, 490 U.S. 319 (1989); Estelle v. Gamble, 429 U.S. 97 (1976). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). As the United States Supreme Court recently held in Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955 (May 21, 2007), a complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at ___, 1974 (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3rd Cir. 1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3rd Cir. 2004) (citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3rd Cir. 1997)). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, ___ U.S. ___, 127 S. Ct. at 1965 citing Papasan v. Allain, 478 U.S. 265, 286 (1986). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, ___ U.S. ___, 127 S.Ct. at 1965. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at ___, 1974.

In other words, at the motion to dismiss stage, a plaintiff is "required to makes a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469

(February 22, 2008) (quoting Phillips v. County of Allegheny, ___ F.3d ___, 2008 WL 305025, at *5 (3rd Cir. Feb. 5, 2008)). "This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 2008 WL 305025, at *6 (quoting Twombly, ___ U.S. at ___, 127 S.Ct. at 1965 n.3).

### III. JURISDICTION

The Court has federal question jurisdiction as one of the issues presented is whether the Department misinterpreted federal law with respect to Weatherbee's right to Medicaid benefits. Lindy v. Lynn, 501 F.2d 1367, 1369 (3rd Cir.1974); see also James v. Richman, 547 F.3d 214, 217 (3rd Cir. 2008) ("The District Court had federal question jurisdiction, as the primary issue presented was whether the Department has misinterpreted federal law regarding James's right to Medicaid benefits"). In addition, Weatherbee has asserted a challenge under the Supremacy Clause, U.S. CONST. art. VI, cl. 2., to 62 PA. STAT. ANN. § 441.6(b) and (c).

### IV. ANALYSIS

The Medicare Catastrophic Coverage Act of 1988 (MCCA), 42 U.S.C. §1396 *et seq*., sets forth the rules that the DPW must follow in determining Medicaid eligibility for applicants such as Weatherbee. The spousal impoverishment provisions of the MCCA "permit a spouse living at home (called the 'community spouse') to reserve certain income and assets to meet the minimum monthly maintenance needs he or she will have while the other spouse (the 'institutionalized spouse') is institutionalized, usually in a nursing home, and becomes eligible for Medicaid." Wisconsin Department of Health and Family Services v. Blumer, 534 U.S. 473, 478 (2002). By adopting the MCCA, Congress sought to protect community spouses from becoming impoverished while simultaneously barring financially secure couples from sheltering their resources in order to qualify for Medicaid. Id. at 480 (citing H.R. Rep. No. 100-105, pt. 2, p. 65) (bill seeks to "end th[e]

pauperization" of the community spouse "by assuring that the community spouse has a sufficient-but not excessive-amount of income and resources available"). To achieve this aim, Congress installed a set of "intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." Id.

In determining Medicaid eligibility for the institutionalized spouse, the MCCA treats the assets and income of the community spouse in separate and distinct ways.[3] With regards to assets, the MCCA protects the community spouse by permitting him or her to retain a standard amount of assets referred to as the "community spouse resource allowance" or "CSRA." Blumer, 534 U.S. at 478. To determine the amount that can be protected for the community spouse, the total of all the couples' resources, whether owned jointly or separately, is calculated as of the time of institutionalization and half of that total is allocated for the community spouse. 42 U.S.C. §1396r-5(c)(1)(A). This calculation does not include certain assets such as the home, an automobile, personal effects and household goods and is subject to a minimum and maximum amount.[4] 42 U.S.C. §1396r-5(c)(5); 42 U.S.C. §1382(b); 42 U.S.C. §1396r-5(c)(2)(B), (f)(2)(A), (g). An applicant may transfer assets to his or her spouse so long as they are solely for the spouse's benefit. 42 U.S.C. §1396p(c)(2)(B)(i). All resources in excess of the CSRA must be spent down to within the applicable resource limits in order for the institutionalized spouse to be eligible for MA-LTC. Blumer, 534 U.S. at 482-83.

A community spouse's income, on the other hand, is completely protected and does not affect the MA-LTC eligibility of the institutionalized spouse. 42 U.S.C. §1396r-5(b)(1) ("[N]o income of

---

[3] In determining whether a resource or payment stream is an available resource, the DPW is required by federal law to use the resource standards of the Supplemental Security Income (SSI) program. 42 U.S.C. §1396a(a)(10)(A)(ii). Under 42 U.S.C. §1396a(a)(10)(C)(i)(III), a state may not evaluate Medicaid eligibility based on income or resources in a manner that is more restrictive than that used by SSI.

[4] As of the date of Weatherbee's application, the CSRA minimum amount was $20,328.00 and the maximum amount was $101,640.00.

the community spouse shall be deemed available to the institutionalized spouse."); see also Blumer, 534 U.S. at 480-81. Where the payment of income from a trust or other instrument is made solely in the name of the community spouse, the income is considered to be income to that spouse only, unless the instrument providing the income specifies otherwise. 42 U.S.C. §1396r-5(b)(2). Federal regulations define payments from an annuity as unearned income. 42 U.S.C. §1382a(a)(2)(B); 20 C.F.R. §416.1121(a).

At issue in this case is whether DPW properly treated the income stream from the Weatherbee Annuity as an available resource in determining his MA-LTC eligibility. Under the SSI regulations which determine what constitutes an available "resource" for MA-LTC purposes, a resource is defined as cash or other liquid assets or any real or personal property that an individual, including a spouse, owns and could convert to cash to be used for his or her support and maintenance. 20 C.F.R. § 416.1201(a). The DPW contends that the income stream from the Weatherbee Annuity qualifies as a resource under the regulation because it can be sold on the secondary market for a lump sum payment:

> The Court: Now, so I take it, then, that really your position, boiled down to its essence, is this. That this income stream is a resource?
>
> Mr. Willig: Yes, sir.

(Oral Hearing Transcript ("Transcript"), October 25, 2007, p. 10; see also Transcript, p. 3 ("[I]t's DPW's position that the payment stream from this, what we characterize as an asset-sheltering annuity, is [sic] an available resource . . ."); Brief in Support of Motion to Dismiss, p. 6 ("In the present case, DPW made a determination that the payment stream from the [Weatherbee] annuity was an available resource.")).

In his original brief in opposition to DPW's motion to dismiss, Weatherbee relied heavily on James v. Richman, 465 F.Supp.2d 395 (M.D. Pa. 2006). In James, the plaintiff sought to reduce he and his wife's assets to the level of impoverishment required for MA-LTC eligibility by purchasing an actuarially sound annuity payable to his wife which contained a clause prohibiting

7

transfer or sale similar to the clause in Weatherbee's annuity. In denying benefits, DPW argued that "notwithstanding the non-assignment provision in the annuity endorsement, Mrs. James' annuity has a market value, and, therefore, is liquid and must be considered a countable resource above the CSRA, thus precluding Plaintiff's eligibility for Medicaid." Id. at 404. The DPW alternatively contended that, "if the annuity is not marketable and liquid, Mrs. James' contractual right to receive payments - i.e., the stream of income derived from the annuity contract and not the annuity itself - is marketable and has a monetary value above the CSRA which makes Plaintiff ineligible for Medicaid benefits." Id.

In rejecting the first argument, the James district court stated:

> Defendant's argument, while attractive on the surface, would contravene the edicts of Transmittal 64, § 3258.9B, which clearly states that annuities purchased as part of a valid retirement plan - regardless of their putative marketability in the view of a third party and the generally prevailing rules of contract law - are not to be penalized. As such, if such an irrevocable actuarially sound commercial annuity were purchased as part of a retirement plan for the sole benefit of the community spouse, there can be no penalty imposed upon the Medicaid applicant.

Id. at 405.[5] The court similarly rejected the DPW's contention that the value of the income stream itself could be considered a countable resource so as to preclude eligibility. The court observed that:

---

[5] Transmittal 64 states in relevant part:

> Annuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate of life expectancy of the beneficiary, the annuity can be deemed actuarially sound.

State Medicaid Manual, Health Care Financing Administration Pub. No. 45-3, Transmittal 64, § 3258 (November 1994).

8

> Such a rule would completely undermine federal law, which excludes income of the community spouse from factoring into the institutionalized spouse's Medicaid eligibility. Indeed, a holding that the market value of an income stream derived from an irrevocable actuarially sound annuity is a countable resource would effectively contravene the MCCA [the Medicare Catastrophic Coverage Act], which provides that "no income of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C. § 1396r-5(b)(1). To be sure, Defendant's argument blurs the distinction drawn by the MCCA between assets and income.

Id. at 406.

On November 12, 2008, the Third Circuit affirmed the district court's decision in James. See James v. Richman, 547 F.3d 214 (3rd Cir. 2008). The Court characterized the "central issue in [the] case" as "whether a non-revocable, non-transferrable annuity may be treated as an available resource by the Department for the purposes of calculating Medicaid eligibility." Id. at 218. The Court first rejected the DPW's contention that the annuity itself was marketable and therefore properly countable as a resource. The Court stated:

> [The SSI regulations] provide that "if an individual has the right, authority or power to liquidate the property, or his or her share of the property, it is considered a[n] (available) resource." 20 C.F.R. § 416.1201(a)(1).
>
> The SSI Program Operations Manual System (POMS) . . . makes it clear that the "power to liquidate" referred to by the regulation is not simply the de facto ability to accomplish a change in ownership of an asset, but must also include the power to do so without incurring legal liability.
>
> Josephine James lacks such power to change ownership in her annuity. The annuity states on its face that it "may not be surrendered, transferred, collaterally assigned, or returned for a return of the premium paid." Even if the Department is correct that Josephine James has the de facto ability to effect a change in ownership of the annuity, she cannot do so without breaching the contract and incurring legal liability. Accordingly, the annuity cannot be treated as an available resource.

Id.

The Court also rejected the alternative argument advanced by the DPW that the income stream generated by an annuity could properly be treated as a countable resource:[6]

> [T]he Department argues that Josephine James could create a new annuity, selling the right to an income stream that is equal to the income to which she is entitled from the existing annuity. Such a transaction would not, however, be a transfer of the existing annuity. It cannot therefore be used to support the treatment of the existing annuity as an available resource. Instead, the Department's position would treat the hypothetical proceeds from the creation of a new annuity as a currently available resource. There is no statutory basis for such a theory and, indeed, adopting it would tend to undermine the MCCA rule that "no income of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C. § 1396r-5(b)(1). *Under such a theory, there is no clear limit on the hypothetical transaction proceeds that could be treated as assets, whether based on the sale of a future stream of payments tied to a fixed income retirement account, social security, or even a regular paycheck.*[7]

Id. at 218-19 (emphasis added). Finally, the Court rejected the DPW's contention that a ruling in James's favor would violate public policy or otherwise be inconsistent with Congressional intent:

> [T]he Department argues that granting eligibility for people in James's situation would undercut the purpose of Medicaid, which was not intended as a general welfare program. We begin by noting that Medicaid is established through an exhaustive set of statutes that thoroughly detail what benefits are to be available and to whom they should be provided. See 42 U.S.C. § 1396 et seq. In this context, we do not create rules based on our own sense of the ultimate purpose of the law being interpreted, but rather seek to implement the purpose of Congress as expressed in the text of the statutes it passed. See Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir.2001) (explaining that the role of the courts in interpreting a statute is to give effect to Congress's intent, and that it is presumed that Congress expresses its intent through the language of a statute). As discussed above, an irrevocable, non-alienable annuity does not fit the statutory definition of an available resource. *In addition, Congress provided a detailed set of rules governing transactions that it considered*

---

[6] In the present case, the DPW relies exclusively on the contention that the income stream generated by the annuity is a countable resource.

[7] In Ross v. Dept. of Public Welfare, 936 A.2d 552, 555 (Pa. Commw. Ct. 2007), the Pennsylvania Commonwealth Court similarly held that the "DPW improperly considered Leonard's income stream from an irrevocable and non-assignable annuity as an available resource based on the existence of a secondary market for such income streams."

> *suspicious, and the purchase of an annuity is not among them.* 42 U.S.C. § 1396p(c). We simply cannot allow a denial of eligibility if there is no statutory justification for that denial. Such justification is lacking here.

Id. at 219 (emphasis added).

The DPW argues that James is distinguishable because the annuity there was purchased prior to February 8, 2006, the effective date of the Deficit Reduction Act of 2005,[8] and because the DPW

---

[8] The relevant portions of the Deficit Reduction Act are set forth below:

> (e)(1) In order to meet the requirements of this section for purposes of section 1396a(a)(18) of this title, a State shall require, as a condition for the provision of medical assistance for services described in subsection (c)(1)(C)(i) of this section (relating to long-term care services) for an individual, the application of the individual for such assistance (including any recertification of eligibility for such assistance) shall disclose a description of any interest the individual or community spouse has in an annuity (or similar financial instrument, as may be specified by the Secretary), regardless of whether the annuity is irrevocable or is treated as an asset. Such application or recertification form shall include a statement that under paragraph (2) the State becomes a remainder beneficiary under such an annuity or similar financial instrument by virtue of the provision of such medical assistance.
>
> (2)(A) In the case of disclosure concerning an annuity under subsection (c)(1)(F) of this section, the State shall notify the issuer of the annuity of the right of the State under such subsection as a preferred remainder beneficiary in the annuity for medical assistance furnished to the individual. Nothing in this paragraph shall be construed as preventing such an issuer from notifying persons with any other remainder interest of the State's remainder interest under such subsection.
>
> (B) In the case of such an issuer receiving notice under subparagraph (A), the State may require the issuer to notify the State when there is a change in the amount of income or principal being withdrawn from the amount that was being

(continued...)

did not rely on 62 PA. STAT. ANN. § 441.6(b) and (c) in denying eligibility in that case. Here, the operative effect of both statutes are squarely at issue. The DPW contends that the Pennsylvania statute is fully consistent with and sanctioned (albeit after the fact) by 42 U.S.C. § 1396p(e)(4) of the Deficit Reduction Act. The DPW summarizes its position in this regard as follows:

> Congress specifically amended the law to permit DPW to count the payment stream from an annuity as a resource in determining MA-LTC eligibility. 42 U.S.C. § 1396p(e)(4). Weatherbee's payment stream is assignable as a matter of Pennsylvania law, and is presumed to be marketable without undue hardship. 62 P.S. § 441.6. Payment streams such as the one at issue in this case are routinely sold on the secondary market. See e.g. http://www.jgwfunding.com/annuity/annuity/html; See also Letter from J.G. Wentworth Co dated July 31, 2007. (Exhibit A). Since Weatherbee's annuity is not any different than the many other so-called "Medicaid friendly" annuities bought and sold on the secondary market, it is clear Weatherbee cannot prevail. The payment stream from Weatherbee's annuity is a resource under SSI standards that apply to MA-LTC. Accord: *Estate of Gross v. North Dakota Dept. of Human Services*, 687 N.W.2d 460, 466 (N.D. 2004) (Annuity was a countable asset for purposes of Medicaid eligibility).

---

[8](...continued)
    withdrawn at the time of the most recent disclosure described in paragraph (1). A State shall take such information into account in determining the amount of the State's obligations for medical assistance or in the individual's eligibility for such assistance.

    (3) The Secretary may provide guidance to States on categories of transactions that may be treated as a transfer of asset for less than fair market value.

    (4) *Nothing in this subsection shall be construed as preventing a State from denying eligibility for medical assistance for an individual based on the income or resources derived from an annuity described in paragraph (1).*

42 U.S.C. § 1396p(e) (emphasis added)

(Brief in Support of Motion to Dismiss, p. 9). The central question, therefore, is whether the meaning attributed to 42 U.S.C. § 1396p(e)(4) by the DPW is supportable under well-established rules of statutory construction.[9]

As stated in Valansi v. Ashcroft, 278 F.3d 203 (3rd Cir. 2002):

> "The first step in interpreting a statute is to determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Marshak v. Treadwell*, 240 F.3d 184, 192 (3d Cir.2001) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). When the statutory language has a clear meaning, we need not look further. *Id.*; *see also In re Crammond*, 23 I & N Dec. 9 (BIA 2001) (examining first the "terms of the statute itself" before turning to "traditional tools of statutory construction, such as the legislative history" to determine Congressional intent). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Marshak*, 240 F.3d at 192 (internal quotation marks omitted).

Valensi, 278 F.3d at 209. Our role is to "give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" Id. at 280 (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982)).

---

[9] The DPW also contends that the legislative history of the Deficit Reduction Act supports its interpretation of 42 U.S.C. § 1396p(e)(4). While I find that resort to the legislative history is unnecessary under the circumstances, I conclude that the portion relied upon by the DPW does not support its construction of 42 U.S.C. § 1396p(e)(4), in any event. The observation is simply made that:

> States and courts interpret [Transmittal 64] differently. In *Mertz v. Houston*, 155 F.Supp.2d 415 (E.D. Pa. 2001), for example, the court held that if an annuity was actuarially sound then the intent of the transfer was not relevant under federal law. In a recent case in Ohio, a state court ruled that it was proper to look at the intent of asset transfers, even if the annuity was actuarially sound. *Bateson v. Ohio Dept. of Job and Family* (Ohio Ct. Appl., 12th, No. CA2003-09-093, Nov. 22, 2004).

See H.R. REP No. 109-362, at 272-73 (2006), *as reprinted in* 2006 U.S.C.C.A.N. 90.

Where a statute is seemingly ambiguous, or where it is unclear "whether Congress has specifically addressed the question at issue, 'a reviewing court should not confine itself to examining a particular statutory provision in isolation.'" Rucker v. Davis, 237 F.3d 1113, 1119 (9th Cir. 2000) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)). Rather, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Id. Statutory construction is a "holistic endeavor," and "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) (quoting United Sav. Assn. of Tex v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371 (1988)) (citations omitted). "We will not assume that Congress intended a statute to create odd or absurd results." Rucker, 237 F.3d at 1119 (citing United States v. Citement Video, Inc., 513 U.S. 64, 69-70 (1994)). Instead, "[c]ourts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the previous version." Emerson Electric Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 187 (3rd Cir. 2006) (quoting Firstar Bank, N.A. v. Faul, 253 F.3d 982, 988 (7th Cir. 2001)).

I find that the language of 42 U.S.C. § 1396p(e)(4), when viewed in the context of the subsection as well as pertinent provisions of the Medicaid Act, is unambiguous and does not support the DPW's reading of it. By its terms, 42 U.S.C. § 1396p(e)(4) expressly limits its effect to "this subsection." It does not purport to alter the well-established rule under the Medicaid Act, contained in 42 U.S.C. § 1396r-5, that "no income of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C. § 1396r-5(b)(1). Indeed, 42 U.S.C. § 1396r-5(a)(1) provides that, "[i]n determining the eligibility for medical assistance of an institutionalized spouse . . ., the provisions of this section supersede any other provision of this subchapter . . . which is inconsistent with them." In my view, 42 U.S.C. § 1396p(e)(4) simply makes clear that which would otherwise

be implied. Namely, that disclosing the purchase of an annuity and naming the state as a remainder beneficiary will not, in and of itself, *prevent* a state from denying eligibility for income or resources derived from an annuity. A state could, for example, deny eligibility for a variety of reasons including, but not necessarily limited to, lack of an actuarially sound annuity or where the income from the annuity was not solely for the benefit of the community spouse. Consistent with the "holistic" approach espoused by the courts in the above cases, and having examined 42 U.S.C. § 1396p(e)(4) in context, I conclude that if Congress had intended to "ring the death knell" for otherwise compliant annuities, it would have said so. It did not.

I also find that it would be incongruous for 42 U.S.C. § 1396p(e)(4) to have the meaning ascribed to it by the DPW. As set forth above, Congress delineated earlier in the subsection those additional requirements with which a Medicaid applicant must comply in order to *successfully* transfer assets, without penalty, to an irrevocable annuity. It is unreasonable to assume that Congress would have intended to take with one hand (i.e., through the operation of 42 U.S.C. § 1396p(e)(4)) that which it had just given with the other.

Turning now to preemption, Weatherbee contends that the Pennsylvania statute upon which the DPW relies in treating the income from an otherwise compliant annuity as an available resource is inconsistent with the treatment of annuities under the Medicaid Act. I agree.

It is a familiar and well-established principle that the Supremacy Clause invalidates state laws that "interfere with, or are contrary to," federal law. U.S. Const. Art. VI, cl. 2. See Hillsborough County v. Automated Med. Labs, Inc., 471 U.S. 707, 712-13 (1985). A conflict between a state and federal law arises when "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avacado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941). As stated in Lankford:

> While Medicaid is a system of cooperative federalism, the same analysis applies; once the state voluntarily accepts the conditions imposed by Congress, the Supremacy Clause obliges it to comply

> with federal requirements. See Jackson v. Rapps, 947 F.2d 332, 336 (8th Cir.1991) (applying conflict preemption doctrine to state AFDC law, analogous to Medicaid's system of cooperative federalism). See also King v. Smith, 392 U.S. 309, 316, 326-27, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Planned Parenthood of Houston & Se. Tex. v. Sanchez, 403 F.3d 324, 337 (5th Cir.2005) ("once a state has accepted federal funds, it is bound by the strings that accompany them").

Lankford, 451 F.3d at 510.

The resolution of this issue is driven largely by my previous conclusion that Congress did not intend, through the operation of 42 U.S.C. § 1396p(e)(4), to permit the DPW to count the income stream from Weatherbee's annuity as a resource under these circumstances. The decision in James is also instructive. To reiterate, the James court, as had the district court below, specifically rejected the DPW's contention that income from an annuity could be treated as an available resource because to do so would "tend to undermine the MCCA rule that "no income of the community spouse shall be deemed available to the institutionalized spouse." James, 547 F.3d at 218-219 (quoting 42 U.S.C. § 1396r-5(b)(1)). The Court was clearly concerned that under the "theory" espoused by the DPW, a whole variety of income streams could improperly be treated as countable resources. Id. at 219. That concern is no less present here. Finally, having surveyed the legislative landscape, the Court concluded that the James annuity was not abusive because its purchase was not among the transactions considered "suspicious" by Congress. Id. I reach the same conclusion with respect to the Weatherbee annuity.

## V. CONCLUSION

For the foregoing reasons, the DPW's Motion to Dismiss is denied. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THEODORE E. WEATHERBEE, by his next friend and agent, CHERYL L. VECCHIO, <br><br> Plaintiff, <br> v. <br><br> ESTELLE B. RICHMAN, in her official capacity as Secretary of the Commonwealth of Pennsylvania Department of Public Welfare, <br><br> Defendant. | C.A. No. 07-134 Erie <br> Judge McLaughlin |

## ORDER

AND NOW, this 22nd day of January, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion to Dismiss is DENIED and the Department of Public Welfare of the Commonwealth of Pennsylvania is precluded from denying benefits on the basis of the income stream generated by Jefferson-Pilot Life Insurance Company annuity #A005390257. The Clerk is directed to mark this case closed.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___